**Robert COATES, et al., Plaintiffs,**

v.

**HEARTLAND WIRELESS COMMUNICATIONS, INC., et al., Defendants.**

**No. Civ.A. 398CV0452–D.**

United States District Court,
N.D. Texas,
Dallas Division.

July 8, 1999.

---

Roger F. Claxton & Robert J. Hill of Claxton & Hill, Dallas, TX, for plaintiffs.

Ralph I. Miller, Penny P. Reid, and Robert R. Summerhays of Weil Gotshal & Manges LLP, Dallas, TX, Joseph S. Allerhand of Weil Gotshal & Manges LLP, New York City, for defendants.

FITZWATER, District Judge.

In a prior opinion in this case, *Coates v. Heartland Wireless Communications, Inc.,* 26 F.Supp.2d 910 (N.D.Tex.1998) (*"Coates I "*), the court granted defendants' motion to dismiss, holding in relevant part that plaintiffs had failed adequately to plead scienter, *id.* at 918–922, but granting them leave to replead. *Id.* at 923. Plaintiffs have filed their first amended complaint ("amended complaint"), and the individual defendants move anew to dismiss, contending *inter alia* that plaintiffs have again failed to plead scienter in the manner required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4. The court agrees that plaintiffs have not pleaded specific facts that support a strong inference that defendants acted with scienter, and therefore grants defendants' motion to dismiss. For the reasons explained below, however, it holds that plaintiffs should be given another opportunity to plead in conformity with the PSLRA and Fed.R.Civ.P. 9(b).

## I

This is a fraud-on-the-market case that follows the March 20, 1997 public announcement of Heartland Wireless Communications, Inc. ("Heartland"), now bankrupt, to write down its subscriber base by approximately 25% and to take a number of charges, including one for $5.2 million for bad debt expense and reserve for uncollectible accounts receivable. Plaintiffs argue that most if not all of these writeoffs and charges should have been taken no later than September 30, 1996, and that Heartland should have disclosed the necessity for the writeoffs, or the circumstances that led to them, no later than November 14, 1996, when Heartland announced third quarter 1996 results, or by February 7, 1997, when Heartland's Board of Directors discussed the company's financial condition at a Board meeting.

Heartland owned and operated wireless cable television systems, primarily in small to mid-size markets in the central United States that were not served by hardwired cable providers. It commenced operations in 1993 and made its initial public offering in 1994. Although Heartland had several competitors, it was considered during the relevant period to be the largest and most successful wireless company based on reported subscriber base.

Plaintiffs Robert Coates ("Coates") and Management Insights, Inc. ("MII") sue Heartland, David E. Webb ("Webb"), L. Allen Wheeler, John R. Bailey ("Bailey"), Alvin H. Lane ("Lane"), John A. Sprague ("Sprague"), and J.R. Holland, Jr. (collectively, the "individual defendants"), who are present or former Heartland officers and/or directors. Coates and MII contend that Heartland and the individual defendants are liable for violating § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1998), promulgated thereunder. They maintain that defendants engaged in a scheme to defraud beginning no later than November 14, 1996 and ending on March 20, 1997, to induce purchases of Heartland stock at artificially inflated prices.[1] Plaintiffs allege that all the individual defendants except Lane are also liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons. Coates and MII posit that defendants concealed from the investing public and the market the truth about Heartland's subscriber base and accounts receivable by intentionally misrepresenting and failing to disclose the actual growth and prospects of Heartland, the value of its assets, and its financial condition. Plaintiffs aver that defendants concealed the truth and failed to disclose it in a November 14, 1996 press release, third quarter 1996 Form 10–Q, December 1996 note exchange offering prospectus, January 22, 1997 announcement, February 1997 note exchange offering prospectus, and 1996 Form 10–K.

Defendants moved to dismiss plaintiffs' complaint. The court granted the motion, holding *inter alia* that the PSLRA codified a ban on group pleading, *Coates I*, 26 F.Supp.2d at 916, and that plaintiffs had failed adequately to plead scienter, *id.* at 918–922.[2] Plaintiffs have filed an amended complaint, and the individual defendants move to dismiss. They maintain that plaintiffs have again failed to plead scien-

1. Heartland has filed for bankruptcy and, due to the automatic stay, the court has administratively closed the case as to it. Only plaintiffs' claims against the individual defendants are at issue in this motion. *See* Am.Compl. ¶ 23 ("As a result of the automatic stay provided for in Section 362 of the Bankruptcy Code and the Court's Order dated December 16, 1998, none of the claims asserted herein are being directly asserted against [Heartland]; however, [Heartland] is referenced herein as a violating party for purposes of plaintiffs' claims for control person liability.").

2. After *Coates I* was published in the bound volume of the Federal Supplement, the court made non-substantive editorial changes to the opinion that appear in the Westlaw version of *Coates I*.

ter in the manner that the PSLRA requires, and that plaintiffs are relying impermissibly on group pleading.[3]

## II

■ The court begins by addressing a threshold procedural question. Although defendants move to dismiss on the ground that plaintiffs have failed to plead scienter in accordance with the PSLRA, the court's conclusion that the amended complaint does not adequately plead scienter is based on constituent reasons that defendants did not present in their motion. This court may dismiss a case for failure to state a claim[4] even if it does so based on arguments that defendants did not themselves raise. *See Guthrie v. Tifco Indus.*, 941 F.2d 374, 379 (5th Cir.1991) (citing 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 301 (2d ed.1990)); *Foreman v. Dallas County, Tex.*, 990 F.Supp. 505, 510 (N.D.Tex.1998) (three-judge court). "Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair." Wright & Miller, *supra* § 1357, at 301 (footnote omitted). The court concludes that because defendants move to dismiss on the ground that plaintiffs have failed adequately to plead scienter, the court may analyze plaintiffs' complaint on its own initiative and dismiss for reasons defendants did not give.

To ensure that this procedure is fair to plaintiffs, the court will permit them to replead in an attempt to conform to the requirements of the PSLRA and Rule 9(b). The court does not suggest that it would abuse its discretion or commit legal error by dismissing for failure to state a claim without permitting a plaintiff to replead. In the present case, however, the court is dismissing based on a pleading deficiency rather than on the ground that, beyond doubt, plaintiffs can plead no set of facts that would entitled them to relief. It is also relying on several reasons that, while related to a ground on which defendants seek dismissal, it has raised *sua sponte.* Although PSLRA dismissals will always be based on a pleading defect, and in all cases in which the court raises dismissal on its own initiative it will be considering arguments that no party has presented, in the present action it is the combination of these two factors, applied to the specific facts of this case, that supports allowing plaintiffs another opportunity to amend.

## III

■ Defendants maintain that plaintiffs' amended complaint fails to plead scienter—"a mental state embracing intent to deceive, manipulate, or defraud"[5]—in the manner that the PSLRA requires.

---

3. In view of plaintiffs' inability to plead scienter, the court need not address the group pleading argument in detail. In at least two instances, however, the amended complaint relies on allegedly fraudulent conduct that is attributed only to Heartland, not to a specific person for whose acts or omissions Heartland can be held liable. *See* Am.Compl. ¶¶ 45–46 (referring to conference call with investors and analysts immediately after Heartland released 1996 third quarter results); ¶¶ 47–48 (concerning January 22, 1997 announcement of Webb's resignation as Heartland's president and CEO). Therefore, plaintiffs' contention, for example, that they have pleaded scienter based on *Heartland's* carefully chosen statements in the November 22, 1996 press release, *see* Ps. Resp. at 4, is inadequate.

4. Although defendants do not identify in their motion the rule on which they rely to seek dismissal, their motion should be treated as a motion to dismiss for failure to state a claim, regardless whether it is based on Rule 9(b), Rule 12(b)(6), or both. *See Shushany v. Allwaste, Inc.*, 992 F.2d 517, 520 (5th Cir.1993) (holding that "[a] dismissal for failure to state fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.").

5. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The PSLRA obligates a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To plead scienter in conformity with Rule 9(b), a plaintiff "must set forth specific facts to support an inference of fraud." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (citing *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)). " 'Courts have uniformly held inadequate a complaint's general averment of the defendant's "knowledge" of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading.' " *Maldonado v. Dominguez*, 137 F.3d 1, 9 (1st Cir. 1998) (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992)). A plaintiff may not rely on boilerplate or conclusory allegations to satisfy its pleading obligations. *See Tuchman*, 14 F.3d at 1067 (holding that plaintiff must plead specific facts, not conclusory allegations); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997) (concluding that boilerplate and conclusory allegations will not suffice); *Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir.1996) (stating that Rule 9(b) sets demanding standard and general averments of defendant's knowledge are not enough); *Lovelace*, 78 F.3d at 1018 (holding that it is insufficient merely to allege that defendant had fraudulent intent). The PSLRA pleading standard (adopted in some circuit courts even before enactment of the PSLRA) requires that the specific facts alleged in the complaint must give rise to a *strong inference* of fraudulent intent. *See* 15 U.S.C. § 78u–4(b)(2); *Burlington*, 114 F.3d at 1418; *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir.1997); *Chill v. General Elec. Co.*, 101 F.3d 263, 267 (2d Cir.1996). When a complaint fails to plead scienter in conformity with the PSLRA, dismissal is required.

*Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 275 (D.Mass.1998) (citing 15 U.S.C. § 78u–4(b)(3)(A)).

## IV

### A

Plaintiffs first plead scienter based on conscious behavior and/or severe recklessness. The supporting allegations are contained principally in ¶ 15 of the amended complaint under the rubric, "defendant's conscious behavior and/or severe recklessness." [6]

In ¶ 15 plaintiffs allege:

[Heartland] and the Individual Defendants acted with scienter. They made a conscious decision to keep from the investing public adverse material facts known to them as described above. Such facts include, among others, the fact that [Heartland]'s reported subscriber count, the accounts receivable and assets were overstated. They knew that a material number of subscribers/customers were nonexistent, had quit paying their bills and/or either already had their service disconnected or would soon have their service disconnected. They knew that a material amount that [Heartland] carried (without reserve) on its books as accounts receivable was attributable to accounts that were materially past due and/or accounts for which service had already been, or would be, disconnected. [Heartland] and the Individual Defendants had actual knowledge of these material facts by November 14, 1996 or, by the absolute latest, February 7, 1997. For [Heartland] and the Individual Defendants not to immediately disclose the omitted material facts regarding the subscriber count and the accounts receivable at the time they became aware was intentionally deceitful and at the very least, [severely] reckless, in as

**6.** To the extent that plaintiffs attempt to plead scienter in other parts of the amended complaint, the court has also considered these assertions in determining whether plaintiffs have adequately pleaded a strong inference of fraud.

much as it was an extreme departure from standards of ordinary care and presented a substantial and material danger of misleading buyers of [Heartland] securities. To the extent any of the Individual Defendants claim not to have been aware of the Company's problems with the aging of its accounts receivable and the overcounting of [Heartland]'s subscriber base by November 14, 1996, it was because they intentionally took steps to ignore and prevent themselves from learning said specific facts and in the process acted intentionally deceitful and at the very least severely reckless, in that such action or inaction was an extreme departure from standards of ordinary care and presented a substantial and material danger of misleading buyers of [Heartland] securities (especially in light of the representations being made by [Heartland] concerning subscriber count and accounts receivable and the analyst coverage of these two factors).

Am.Compl. ¶ 15 (footnote omitted).

Plaintiffs also allege that no later than November 14, 1996, defendants actually knew, or were severely reckless in not knowing, that Heartland had materially overstated the number of its subscribers because Heartland was counting (1) persons who were residents of multiple dwelling units ("MDUs") with which Heartland had a contract with management to provide wireless services, but who had not themselves signed up for service (*i.e.*, if Heartland contracted with a 500–unit MDU to provide service, once the contract was signed, it would book 500 new subscribers regardless whether individual residents had purchased its services); (2) persons who had signed up for service but were delinquent in paying their bills and would be disconnected; and (3) persons to whom service had already been disconnected because they had not paid their bills.

Coates and MII also allege that Heartland and the individual defendants knew by November 14, 1996 (the date Heartland reported unaudited third quarter results), or at least by February 7, 1997 (the date Heartland's Board of Directors met), that Heartland had substantially and materially overstated its accounts receivable by including amounts that were probably uncollectible because they were owed by subscribers who were materially past due on their bills and had already been disconnected or were slated to be disconnected in the near future.

## B

The Fifth Circuit held pre-PSLRA that when a defendant's motive is not apparent, a plaintiff can plead scienter "by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Tuchman*, 14 F.3d at 1068. Conscious behavior is a "more stringent standard." *Lovelace*, 78 F.3d at 1019 n. 3. Conscious behavior, of course, means conscious *mis*behavior. *See Burlington*, 114 F.3d at 1418 (holding that plaintiff must plead strong circumstantial evidence of conscious misbehavior); *see also Maldonado*, 137 F.3d at 9 (concluding that conscious misbehavior requires strong inference that defendant knew statement or omission was false or misleading). It is also impermissible to allege fraud by hindsight, that is, to seize upon disclosures in later reports and allege that they should have been made in earlier ones. *See, e.g., Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). Nor may a plaintiff rely on rote allegations that a defendant "knowingly" did something. *Melder v. Morris*, 27 F.3d 1097, 1104 (5th Cir.1994).

## C

Coates and MII rely on the subscriber writedown to contend that they have pleaded a strong inference of fraud based on conscious behavior. They allege that defendants knew, but failed to disclose, that a material number of Heartland subscribers were nonexistent, had quit paying

their bills, and/or had already had or would soon have their service disconnected.

### 1

■ Plaintiffs' conclusory allegations that the individual defendants knew that Heartland was counting "nonexistent" subscribers fail to create a strong inference of fraud. The so-called "nonexistent" subscribers were so because Heartland adopted a company policy of counting MDU residents as subscribers even if they had not personally signed up for service. It is in this sense alone that the amended complaint alleges that they were "nonexistent."[7] Here the amended complaint suffers from an obvious flaw. There is no corresponding assertion that Heartland or any individual defendant adopted the policy with intent to defraud. Therefore, if a defendant was consciously aware that company policy was being followed until the March 20, 1997 writedown, this is not circumstantial evidence of fraud; it is no more than proof of adherence to company policy. And since mismanagement alone does not support a strong inference of fraud, *see, e.g., Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 53 (2d Cir.1995), plaintiffs were obligated to plead that defendants adopted the policy with conscious awareness that it was false or misleading.[8] There is no specific averment in the amended complaint, however, that in this or any similar industry it is fraudulent or misleading to count as subscribers people who reside in an MDU that has itself contracted for wireless cable service to be provided exclusively[9] to the entire unit by one company. Plaintiffs cannot leave it to the court to divine this from the amended complaint. Even had plaintiffs asserted that the policy violated industry standards, such violations would alone be insufficient without corresponding fraudulent intent. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (holding that allegations of violations of GAAP or SEC regulations, without corresponding fraudulent intent, are not enough); *Chill,* 101 F.3d at 270 (same); *Lovelace,* 78 F.3d at 1020 (concluding that bare allegations about industry custom are "precisely the type of conclusory allegation that motivated the heightened pleading standards of Rule 9(b) in the first place" and are insufficient to set forth specific facts that indicate conscious behavior).

Plaintiffs' MDU allegations also fail to raise a strong inference of fraud because plaintiffs do not identify any specific instances where MDU subscribers were improperly counted. *Cf. Lirette,* 27 F.Supp.2d. at 278 (" 'To adequately plead financial fraud based on improper revenue recognition, Plaintiffs must allege, at a minimum, some particular transactions where revenues were improperly recorded, including the names of the customers, the terms of specific transactions, when the transactions occurred, and the approximate amount of the fraudulent transactions.' " (quoting *In re Oak Tech. Sec. Litig.,* 1997 WL 448168, at *8 (N.D.Cal. Aug. 1, 1997)). Plaintiffs allege that if an MDU

---

7. According to the amended complaint, of the 219,515 subscribers that Heartland claimed to have as of October 31, 1996, 26,300 were counted based on MDU contracts. *See* Am. Compl. ¶¶ 20 n. 7 and 43.

8. Nor, as defendants point out in their motion, do plaintiffs allege that defendants knew, or were severely reckless in not knowing, that Heartland's method of counting MDU subscribers would result in overstating Heartland's subscriber base.

9. Plaintiffs allege that Heartland entered into a contract with management to provide wireless services to an MDU. They aver that wireless cable systems receive incoming signals and in turn transmit them from an antenna located on a tower to a small receiving antenna on a subscriber's rooftop, where the signals are converted and then travel through coaxial cable to a de-scrambling converter on the subscriber's television set. It can be inferred that when Heartland contracted to provide wireless cable service to a specific MDU property, such as an apartment complex, it was the exclusive cable service provider for anyone in the entire complex who desired to subscribe.

contained 500 units, Heartland counted all 500 residences as subscribers. *See* Am. Compl. ¶ 14. They do not provide facts, however, regarding how many residents of a particular MDU in fact subscribed. This type of detail critically impacts whether the pleading raises a strong inference of fraud. For example, if a company such as Heartland provides exclusive wireless cable service to 26,300 separate MDU properties, counts all residents of each MDU property as subscribers, and is off in its count by one subscriber per MDU property, it has overstated its subscriber base by 26,300 subscribers, but the degree of accuracy produced by this method does not support a strong inference of fraud. Although there is nothing in the amended complaint to support the conclusion that Heartland's counting method was similarly as accurate, there likewise is nothing to show specifically how it was methodologically faulty.

2

■ Plaintiffs also aver that Heartland and the individual defendants concealed the fact that a material number of subscribers had quit paying their bills and/or either had already had their service disconnected or would soon have it disconnected. They contend that most if not all the charges taken on March 20, 1997 should have been taken no later than September 30, 1996.

This assertion is also inadequate to give rise to a strong inference of fraud. Plaintiffs point to the number of subscribers

Heartland wrote off on March 20, 1997 and contend that defendants knew no later than November 14, 1996 that the company's subscriber base was materially overstated. Apart from the MDU subscribers, which the court has already addressed, Heartland wrote off 20,700 soft disconnect customers and 12,300 subscribers deemed unrecoverable.[10] Defendants' concealment of soft disconnect subscribers cannot support a strong inference of fraud because, according to a statement in a Heartland press release that plaintiffs do not challenge, soft disconnect subscribers are common in the industry.[11] *See* Am.Compl. ¶ 50. Plaintiffs do not plead specifically how the individual defendants were acting fraudulently by counting soft disconnects as customers in a manner common to the wireless cable industry. *Cf. Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir.1994) (holding that pleading that suggested that defendants should have been more alert or more skeptical regarding loan loss reserves, but did not indicate that management was promoting fraud, was inadequate to satisfy scienter requirement); *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994) (concluding that the federal securities laws do not guarantee sound business practices and do not protect investors against reverses); *Tuchman*, 14 F.3d at 1070 (holding that corporate mismanagement does not give rise to Rule 10b–5 claim).[12]

**10.** Plaintiffs appear in their amended complaint to transpose the numbers contained in Heartland's press release. They assert that 20,700 subscribers were deemed unrecoverable and that 12,300 customers were soft disconnects. *See* Am.Compl. ¶ 20 n. 7.

**11.** Plaintiffs advance other allegations concerning soft disconnects and the Heartland press release, *see, e.g.,* Am.Compl. ¶ 46 n. 10, but do not contest the statement that soft disconnect subscribers are common in the industry.

**12.** Plaintiffs allege that "Heartland" held a conference call with investors and analysts

immediately after it announced 1996 third quarter results. According to plaintiffs, when asked about why average revenue per subscriber was lower than expected, "Heartland" made misleading statements concerning soft disconnect customers. This allegation does not identify the Heartland officer or employee who made the statement and may be disregarded as an impermissible group pleading. *See Coates I,* 26 F.Supp.2d at 916. In view of plaintiffs' allegation that some calls were recorded, Am.Compl. ¶ 5, plaintiffs' failure to identify the speaker casts doubt on their ability to plead a strong inference of fraud.

**3**

■ Nor have plaintiffs pleaded a strong inference of fraud based on the 12,300 unrecoverable subscribers. Plaintiffs aver that defendants knew no later than November 14, 1996 that these customers should already have been written off, that is, as soon as it was clear that the accounts were unrecoverable. But the basis for this assertion is the age of the receivables. This predicate is flawed in two respects.

First, plaintiffs do not plead how many (if any) of these subscribers were overdue in their bills (and by how long) as of November 14, 1996. They merely allege in conclusory fashion that · Heartland was counting as customers subscribers who were 60 days or more past due in the payment of their bills. *See* Am.Compl. ¶ 14; *Lirette*, 27 F.Supp.2d at 278.

Second, and more significantly, plaintiffs' definition of unrecoverability is based on the conclusory assertion that it was known in the wireless cable market that customers whose bills were overdue by 60 days or more would in reasonable probability never pay. *See* Am.Compl. ¶ 14 (alleging that defendants had "direct knowledge that customers in the wireless cable market who were 60 or more days past due would in all reasonable probability never pay and that collection efforts were not economically feasible, manageable or even being considered by management."). Because this averment is akin to a bare allegation of industry custom, it is insufficient. *See Lovelace*, 78 F.3d at 1020 (holding inadequate bare allegation about industry custom). Absent a satisfactory premise for the contention that 60–day–old receivables were uncollectible, plaintiffs have failed to plead facts that support a strong inference of fraud.[13]

**D**

■ Plaintiffs also attempt to plead scienter on the basis that defendants had actual knowledge of, but concealed, the fact that Heartland had materially overstated its accounts receivable. They maintain that defendants knew the age, amounts, uncollectibility, and materiality of the receivables.[14]

Fundamental to plaintiffs' attempt to plead fraud is the premise that defendants knew of, but intentionally concealed, material information about Heartland's receivables. To allege scienter based on conscious conduct, a plaintiff must plead strong circumstantial evidence of misbehavior. *Burlington*, 114 F.3d at 1418. It cannot be strongly inferred that a person who conceals *immaterial* information acts with intent to defraud. *See Tuchman*, 14 F.3d at 1069 (holding that complaint failed to state securities claim when plaintiff did not plead that defendants knew that statements were materially false or misleading); *Suna*, 107 F.3d at 68 (stating that plaintiff must plead specific facts that make it reasonable to believe that defendant knew statement was materially false or misleading).

This ground for plaintiffs' claim suffers from several defects stemming from their failure to plead specific facts that support the premise that defendants concealed material financial information. First, if

---

**13.** To the extent that plaintiffs allege that the individual defendants knew of the overstated subscriber base due to reports generated in preparation for third quarter 1996 financial reporting and in the performance of due diligence in the two debt offerings, the court need not reach this issue because the court has concluded that plaintiffs' allegations as to subscriber base are inadequate to allege a strong inference of fraud. Thus the timing of defendants' knowledge of the alleged fraudulent activity is irrelevant. Moreover, plaintiffs have neither identified specific reports nor alleged that subscriber counts were contained in or used in preparing the debt offering prospectuses, such that due diligence would have encompassed knowledge of such information.

**14.** To the extent that plaintiffs rely on unspecified reports, *see, e.g.,* Am.Compl. ¶ 9, the amended complaint lacks requisite specificity. *See Lirette*, 27 F.Supp.2d at 283.

the materiality of the receivables is gauged by its relation to the number of subscribers written down, *see, e.g.,* Am. Compl. ¶ 14 (alleging that Heartland and individual defendants overstated materially the accounts receivable attributable to subscribers who had been disconnected from service and/or had seriously past due balances), the court has already explained why the subscriber-based allegations are inadequate to support a strong inference of fraud. Because these allegations are insufficient, the subscriber-based accounts receivable allegations also fail.

Second, if plaintiffs are attempting to plead that the amount of overstated receivables is otherwise material (*i.e.,* without considering the amount as it relates to the percentage of subscribers written down), they have not pleaded facts that specify the significance of the overstated receivables in relation to Heartland's total financial picture. Plaintiffs assert throughout their complaint that Heartland wrote down $5.2 million due to unpaid and uncollectible accounts receivable and that defendants knew well in advance that a substantial write down of $4.2 million or more in uncollectible receivables was necessary. Nowhere in the 42–page, 65–paragraph (including ten footnotes) amended complaint, however, do plaintiffs allege specific financial information that would allow the inference that $5.2 million was a material writedown. In *In re Westinghouse Securities Litigation,* 90 F.3d 696 (3d Cir.1996), for example, the Third Circuit held immaterial the fact that loan loss reserves would have to be written down in an amount equal to 0.54% of the company's quarterly income and that assets that should have been classified as nonearning loans equaled barely 1%, 0.51%, and 1.2%, respectively, of the company's current assets for the pertinent quarter. *Id.* at 715. While the court cannot say that $5.2 million is similarly as minuscule for a company like Heartland, the point is that the amended complaint does not plead specific facts that provide the answer. *See Shushany v. Allwaste, Inc.,* 992 F.2d 517, 522 (5th Cir.1993) (holding that complaint did not satisfy Rule 9(b) where *inter alia* it did not specify whether accounting adjustments incorporated in company financial reports were material in light of company's overall financial position); *Gross,* 93 F.3d at 996 (holding inadequate under Rule 9(b) pleading that alleged that company had overstated its revenue and earnings but did not specify *inter alia* net effect on company's earnings); *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1419 (7th Cir.1992) (stating that allegation that company failed to establish adequate reserves did not satisfy Rule 9(b) where plaintiff failed to allege what the reserves were or how great they should have been). In view of the public availability of Heartland financial documents such as Forms 10–Q and 10–K, these are contextual facts that plaintiffs could easily have pleaded had they supported their theory of fraud.[15]

Plaintiffs are therefore left with the conclusory allegations that a Flash Report that the individual defendants received at a February 7, 1997 Directors meeting indicated that Heartland's receivables that were at least 60, 90, or 120 days overdue totaled approximately $3 million, which everyone in attendance "knew to be an amount which was highly material to the Company," Am. Compl. ¶ 11;[16] that de-

---

**15.** Plaintiffs obviously had access to these types of documents because they assert that Heartland improperly concealed subscriber and accounts receivable information from its third quarter 1996 Form 10–Q and 1996 Form 10–K. *See* Am.Compl. ¶ 14.

**16.** Plaintiffs also emphasize that the Flash Report could easily be generated. *See* Ps. Resp. at 23; Am.Compl. ¶¶ 11 n. 2, 15 n. 3. As the First Circuit explained in *Shaw v. Digital Equipment Corp.,* however, a " 'highly-efficient reporting system' may speak to the question of *how* defendants might have known what they allegedly knew, but absent some indication of the specific factual *content* of any single report generated by the alleged reporting system, do[es] not independently provide a factual basis for inferring any such

fendant Lane "voiced concern" at the meeting concerning the age and amount of the receivables and "recognized the problem" presented by them, *id.* ¶ 12; that the individual defendants "were well aware of the Company's fundamental problems as evidenced and indicated by the highly aged condition of the Company's accounts receivable," *id.;* that they knew and understood the adverse accounts receivable aging information reflected in the Flash Report and other financial reports, and knew that Heartland's accounts receivable and assets, as well as its subscriber base, were "substantially overstated," *id.* ¶ 13; that Heartland was counting revenue amounts "without adequate reserve," *id.* ¶ 14; that. a "material amount" that Heartland carried without reserve on its books as accounts receivable was attributable to past due accounts for which service had been or would be disconnected, *id.* ¶ 15; that the December 1996 debt exchange was "badly needed,"[17] *id.* ¶ 20; that the $5.2 million "figure was material to the Company's overall financial condition," *id.* ¶ 47; and that the market proved that the accounts receivable information was "clearly material," *id.* ¶ 51. Conclusory allegations are not sufficient, *Tuchman,* 14 F.3d at 1067, and allegations that do not contain specific factual bases for believing that defendant knew a concealment was materially false and misleading, *cf. id.* at 1068–69, are inadequate to satisfy Rule 9(b). Nor is it sufficient to rest materiality on the market's reaction once information was disclosed, *cf. Geiger v. Solomon–Page Group, Ltd.,* 933 F.Supp. 1180, 1188 (S.D.N.Y.1996) ("Evidence of stock price movement may be relevant to the issue of materiality but it is not determinative."), or on a conclusory allegation that the company failed to provide ade-

quate reserves or to perform other management tasks competently, *Serabian,* 24 F.3d at 363.

Third, if plaintiffs are relying on the age of the receivables, they have failed for the reasons explained above concerning plaintiffs' subscriber-based argument to plead facts to support the conclusory assertion that receivables 60 days or more past due are probably uncollectible.

Alternatively, plaintiffs arguably are alleging a claim based on Heartland's judgment concerning when collectibility became doubtful. *Cf. Westinghouse,* 90 F.3d at 711 (holding that complaint was sufficient because it did not merely challenge defendants' judgment regarding when collectibility became doubtful). Plaintiffs do not allege specific facts concerning how Heartland booked revenue from MDU subscribers. *Cf. Lirette,* 27 F.Supp.2d at 278. Questioning the timing of the writedown of the subscribers who had quit paying and the soft disconnect subscribers does not provide a strong inference of fraud. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("If all that is involved is a dispute about the timing of the write-off, ... we do not have fraud; we may not even have negligence.").

### E

Plaintiffs also attempt to plead scienter based on severe recklessness. Severe recklessness "is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so

---

knowledge," and allegations concerning such a system do not "substantially assist a securities fraud complaint in overcoming the hurdle of Rule 9(b)." *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1224 n. 38 (1st Cir.1996).

**17.** The only facts pleaded in the amended complaint concerning the debt exchange are

that the debt offerings would fail if the alleged overstatements were revealed. Am.Compl. ¶¶ 18, 20, 37. These assertions do not explain *why* the debt exchange was badly needed and therefore do not provide necessary assertions to plead specifically that a writedown of $5.2 million was material to Heartland.

obvious that the defendant must have been aware of it.'" *Shushany,* 992 F.2d at 521 (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)). "A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Lovelace,* 78 F.3d at 1018 n. 2. "The facts alleged to support recklessness must be 'strong circumstantial evidence' of that recklessness" and "must, in fact, approximate an actual intent to aid in the fraud being perpetrated." *Chill,* 101 F.3d at 269 (quoting *Acito,* 47 F.3d at 52, and *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 121 (2d Cir.1982)); *see Maldonado,* 137 F.3d at 9 & n. 4 (holding that severe recklessness requires strong inference that defendant knew statement or omission was false or misleading). A plaintiff cannot rely on rote and conclusory allegations that a defendant acted recklessly. *Melder,* 27 F.3d at 1103–04.

■ Plaintiffs' severe recklessness allegations are virtually identical to the ones on which they rely to assert that defendants acted with conscious misbehavior. *See, e.g.,* Am.Compl. ¶ 15. The court holds for the reasons already explained, and after applying the severe recklessness standard to its analysis above, that plaintiffs have also failed to plead scienter under this standard. Plaintiffs have not pleaded specific facts that support both required

elements, *see Lovelace,* 78 F.3d at 1018 n. 2, to show that it was severely reckless for defendants to (1) follow, or conceal that they were following, Heartland's company policy concerning how MDU residents would be counted; (2) count, or conceal that Heartland was counting, soft disconnect subscribers, which were common in the industry; or (3) not treat, or conceal that Heartland was not treating, as uncollectible a group of subscribers who were 60 days or more past due in paying their bills, based on a conclusory assertion that it was widely known in the industry that such subscribers were not likely ever to pay. "Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege, with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado,* 137 F.3d at 9 n. 4 (citing *Cook v. Avien, Inc.,* 573 F.2d 685, 692 (1st Cir. 1978)). Plaintiffs do not allege that defendants had full knowledge that it was dangerous to adopt the MDU counting policy or to follow industry custom concerning the counting of soft disconnects.

Plaintiffs also fail to plead specifically the facts necessary to establish that it was severely reckless for the individual defendants to conceal a need to write down the receivables associated with these types of subscribers, or to conceal the need to write down a sum of money ($5.2 million) that plaintiffs have not yet established, based on specifically-asserted facts, was material to Heartland's total financial picture.[18]

---

**18.** Citing *Shaw* plaintiffs also argue that the temporal proximity between the revelation of the bad news on March 20, 1997 and Heartland's last positive statements is circumstantial evidence that defendants acted at least recklessly. In *Shaw* the First Circuit held that while the short time frame between an allegedly fraudulent statement or omission and a later disclosure of inconsistent information is not alone sufficient factual grounding to satisfy Rule 9(b), temporal proximity may be considered as a circumstance that potentially bolsters the complaint's claims of fraud. *Shaw,* 82 F.3d at 1225. The *Shaw* plaintiffs

alleged that the defendant company had made misleading statements, and had failed to make disclosures, in securities filings for a stock offering that commenced just 11 days before the close of the quarter then in progress, and about three weeks before the company announced unexpectedly negative earnings for that quarter. *Id.* at 1199. The First Circuit held that the proximity of the date of the allegedly misleading statements and omissions to the end of the quarter and the date of eventual disclosure provided some factual support to be taken into account. *Id.* at 1225. The instant case, which must be assessed on

## V

### A

■ The Fifth Circuit held pre-PSLRA that scienter could be averred based on a defendant's motive to commit fraud. *Tuchman*, 14 F.3d at 1068. Following enactment of the PSLRA, courts have disagreed about whether a plaintiff can plead scienter based on motive and opportunity. *Compare Maldonado*, 137 F.3d at 10 n. 6 (citing cases) (holding that PSLRA does not permit scienter to be pleaded based on motive and opportunity) *with Ellison v. American Image Motor Co.*, 36 F.Supp.2d 628, 637 (S.D.N.Y.1999) (noting that Second Circuit had recently cited motive and opportunity and holding that this standard appears to be sufficient under the PSLRA). The Second Circuit, widely acknowledged to have originated the PSLRA's "strong inference" standard,[19] has since held that a plaintiff may plead scienter "by alleging facts to show that defendants had both motive and opportunity to commit fraud." *Stevelman*, 174 F.3d at 84. This court therefore holds that scienter can be pleaded based on motive and opportunity to commit fraud.[20]

To plead motive, a plaintiff must aver with particularity the concrete benefits that could be recognized by a statement or omission. *See Shields*, 25 F.3d at 1130. To plead opportunity, a plaintiff must allege specific facts that set out the means and likely prospect of achieving concrete benefits by the means alleged. *See id.*[21]

### B

■ Plaintiffs allege that Heartland and the individual defendants were motivated to commit fraud because they wanted to market Heartland to a third party as a lucrative acquisition candidate, to enable Heartland to restructure its debt through December 1996 and February 1997 debt offerings, and to permit Heartland to acquire new systems and companies using its stock. Plaintiffs also aver that the individual defendants—each of whom signed the debt prospectuses—would incur huge personal liability if the truth about Heartland's subscriber base and accounts receivables were disclosed, and that defendant Webb would incur personal liability on his brokerage trading account.

Plaintiffs first allege that Heartland and the individual defendants were motivated to commit securities fraud because Heartland desired to market itself to a third party.[22] They cite analyst reports that Heartland was an attractive investment for a regional Bell operating company ("RBOC"). Plaintiffs contend that if the truth had become known, Heartland would no longer have been considered a viable acquisition candidate.

---

its own facts, does not contain evidence of similar temporal proximity that circumstantially supports plaintiffs' fraud claim.

**19.** *See, e.g., Ellison*, 36 F.Supp.2d at 637; *In re Aetna Inc. Sec. Litig.*, 34 F.Supp.2d 935, 951 (E.D.Pa.1999); *but see, e.g., Sheldon v. Vermonty*, 31 F.Supp.2d 1287, 1292–93 (D.Kan.1998) (noting controversy regarding whether Congress intended to adopt Second Circuit scienter test or even stricter pleading requirement).

**20.** In *Coates I* the court reserved this question because plaintiffs could not plead scienter on any basis. *Coates I*, 26 F.Supp.2d at 918 n. 5. The court now joins other district judges in this circuit in holding that, under the PSLRA, scienter can be pleaded based on motive and opportunity. *See Robertson v. Strassner*, 32 F.Supp.2d 443, 447 (S.D.Tex.1998); *Zucker-*

man v. Foxmeyer Health Corp.*, 4 F.Supp.2d 618, 623 (N.D.Tex.1998) (Maloney, J.); *STI Classic Fund v. Bollinger Indus., Inc.*, 1996 WL 885802, at *1 (N.D.Tex. Oct.25, 1996) (Sanderson, J.), *adopted*, 1996 WL 866699 (N.D.Tex. Nov. 12, 1996) (Buchmeyer, C.J.).

**21.** Because the court holds that plaintiffs have not adequately pleaded a motive for defendants to commit securities fraud, it need not address whether the individual defendants had the opportunity to do so.

**22.** In *Coates I*, 26 F.Supp.2d at 918–19, the court rejected plaintiffs' acquisition-based motive allegations on grounds that the court need not revisit in view of the reasoning it now follows.

Rule 9(b) requires that "[p]laintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Burlington*, 114 F.3d at 1418 (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 285 (3d Cir.1992)). This alleged motive to commit fraud is not plausible as pleaded. Essentially, plaintiffs assert that Heartland's viability as an acquisition candidate depended on the price of its stock. *See* Am.Compl. ¶ 18 (alleging that Heartland would be required to take material charges to its subscriber base and write down its related accounts receivable, its stock price would fall, it would no longer be considered a strong and growing company, and its viability as a potential acquisition candidate would end). This presumes that a sophisticated company like an RBOC would do little or no due diligence before acquiring a company like Heartland. This, of course, is the only way that Heartland's alleged concealment of negative subscriber and financial information would enable it to induce an acquisition that would not otherwise occur. This premise defies common sense. If, as plaintiffs allege, the individual defendants could have been expected to "reap substantial monetary benefits," Am.Compl. ¶ 17, from selling Heartland, it is only logical to assume that a sophisticated and prudent purchaser interested in paying such handsome sums would examine in great detail the subscriber base and financial condition of the company it was purchasing. Plaintiffs allege, for example, that Webb told Heartland's senior management and Board of Directors that Southwestern Bell Corp.[23] was interested in purchasing Heartland or some of its systems. *Id.* It borders on the frivolous to assert that a company of such size and business experience would consummate a significant acquisition based on the strength and veracity of what the seller was telling it rather than on its own scrutiny of pertinent customer and financial information. The first motive for fraud on which plaintiffs rely defies common sense, is facially implausible, and does not give rise to a strong inference of fraud.[24]

Plaintiffs' motive theory also stumbles in the context of a fraud-on-the-market claim. Fraud-on-the-market liability assumes fundamentally that the market sets the price of stock at an artificially high level in light of misrepresentations and/or omissions of a corporation or its insiders that convey a false or misleading impression. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir.1996). Fraud-on-the-market permits a presumption of investor reliance on the integrity of the stock price. *See Basic Inc. v. Levinson*, 485 U.S. 224, 241–47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). But the underlying rationale of the presumption affects other components of a securities fraud claim. *See Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1218 (1st Cir.1996) (holding that presumption shifts critical focus of materiality inquiry). In the present case, it undercuts the plausibility of plaintiffs' motive theory.

According to plaintiffs, defendants were motivated to inflate artificially the price of Heartland's stock in the market *as a whole* because that price would somehow influence the interest of *potential purchasers* in acquiring Heartland. This seems to be nothing more than an "I want to be noticed" theory, that is, an assertion that defendants sought to ensure that Heartland's stock would trade at a certain price so that potential purchasers would recognize it as a viable acquisition candidate. The amended complaint does not contain specific facts, however, that explain why

**23.** This likely refers to Southwestern Bell Telephone Co., a subsidiary of SBC Communications Inc.

**24.** This is not, by contrast, a case involving sales of stock by insiders. *Cf. Stevelman*, 174 F.3d at 85–86 (addressing allegation that after representations were made, several corporate officers made large stock sales). The court rejected in *Coates I* the sole allegation concerning the sale of part of defendant Webb's shares to satisfy a margin call. *Coates I*, 26 F.Supp.2d at 919–920.

defendants would be motivated to commit fraud on an entire market when their misconduct would be quickly revealed to the one party who mattered—the RBOC or other potential purchaser—once it began testing the accuracy of Heartland's subscriber base and accounts receivable.

▮ Plaintiffs assert second that defendants were motivated to commit securities fraud because "[Heartland's] hopes for a debt restructuring through the December 1996 and February 1997 debt offerings would be crushed and/or would result in enormous securities liability for the company, and [defendants'] investments in the Company would become worth far less." Am.Compl. ¶ 18; *see id.* ¶ 37. They allege "that serious difficulties would emerge concerning [Heartland's] badly needed debt exchange"[25] and that all defendants who signed the prospectuses would incur "huge personal liability." *Id.* ¶ 20.[26]

The court holds that plaintiffs have not pleaded a strong inference of fraud on this basis. Rule 9(b) jurisprudence, and now the PSLRA, seeks to eliminate as a predicate for a securities fraud claim allegations of motive that would effectively eliminate the state of mind requirement. *See Melder,* 27 F.3d at 1102 (pre-PSLRA case). Accordingly, assertions that would almost universally be true, such as the desire to raise capital, *Novak v. Kasaks,* 997 F.Supp. 425, 430 n. 5, *on consideration of am. compl.,* 26 F.Supp.2d 658 (S.D.N.Y. 1998), or successfully to bring a public offering to fruition, *Melder,* 27 F.3d at 1102, economic self-interest, *see Tuchman,* 14 F.3d at 1068, and the desire to maintain good relationships with suppliers, encourage retailers, forestall lenders, and protect

one's executive position, *In re Crystal Brands Securities Litigation,* 862 F.Supp. 745, 749 (D.Conn.1994), are inadequate of themselves to plead motive. In the present case, plaintiffs allege that defendants desired to effect two successful debt exchange offerings and to avoid personal liability for signing the relevant prospectuses. These allegations of motive would always be sufficient, however, to require that a company and those who signed its prospectuses defend securities fraud actions any time a downturn in the price of the company's stock followed a public offering. They are therefore alone insufficient to plead a strong inference of fraud. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 805, 814 (2d Cir.1996) (holding inadequate to plead motive allegation that company desired to maintain inflated stock price and illusion of profitability to maximize marketability of $700 million of debt securities and minimize interest on those securities). This is particularly true where, as here, plaintiffs do not allege specific facts that show that the price of Heartland stock potentially impacted the success of the debt exchanges.

▮ Plaintiffs contend in their amended complaint, as they did in their complaint, that defendants were motivated to commit fraud because, using company stock, Heartland intended to acquire new systems and companies. The court held in *Coates I* that this allegation of motive was insufficient. *Coates I,* 26 F.Supp.2d at 919. Plaintiffs have not made the changes in their amended complaint that are necessary to withstand dismissal. The court

**25.** As the court explains *supra* at note 17, the amended complaint contains no specific allegations to support the conclusory assertion that the debt exchanges were "badly needed."

**26.** Plaintiffs assert in their brief, but not in their amended complaint, that Heartland stood to derive $140 million from the debt restructuring, enabling it to meet its obligations, including debt obligations to Jupiter Partners L.P. ("Jupiter"), defendant

Sprague's company. Because this allegation is not contained in the amended complaint, plaintiffs may not rely on it. Moreover, although plaintiffs allege that Jupiter owned $40 million in convertible notes, they aver only that Jupiter stood to make much money if Southwestern Bell Corp. purchased Heartland, not that the debt exchange would enable Heartland to meet its obligations to Jupiter. *See* Am.Compl. ¶ 28.

holds that they have failed to plead a strong inference of fraud on this ground. Plaintiffs also rely in their amended complaint on defendant Webb's motive to inflate the price of Heartland stock to avoid personal liability on his brokerage trading account. As in *Coates I*, this allegation is inadequate to plead a strong inference of fraud. *See id.* at 919–920. Plaintiffs' amended complaint alleges that Bailey personally profited from the alleged fraud by selling 40,000 shares (87%) of his Heartland stock for $1.1 million at artificially inflated prices. This allegation fails for the reasons explained regarding Webb in *Coates I*, 26 F.Supp.2d. at 919–20, and because plaintiffs have failed to provide sufficient particularity (such as the date of the transaction) in this allegation.

## VI

Plaintiffs complain that defendants have analyzed plaintiffs' scienter allegations piecemeal rather than by viewing the amended complaint as a whole. Defendants respond that they do not maintain that each of plaintiffs' scienter allegations must individually and independently support a strong inference of fraudulent intent. Although the court holds that plaintiffs' amended complaint is insufficient when viewed in the aggregate, *see Shushany*, 992 F.2d at 524 (basing holding that complaint was inadequate to plead fraud on entire complaint rather than on any single defect), it is not error for a district court to compartmentalize the evidence and wipe the slate clean after considering each component, *see Westinghouse*, 90 F.3d at 712.

## VII

Because the court holds that plaintiffs' § 10(b) and Rule 10b–5 claims fail, their control person liability claim likewise is dismissed.

## VIII

Plaintiffs' assert that they have lost $3 million and they question whether the pleading standards should be applied in a manner that deprives them of a right to pursue litigation before they can conduct discovery. As the Fifth Circuit observed in *Lovelace*, 78 F.3d at 1021, while the court is sympathetic to plaintiffs' losses,[27] § 10(b) provides a remedy for fraud and Rule 9(b) requires that fraud be pleaded with particularity. The federal securities laws do not guarantee sound business practices and do not protect investors against reverses. *Serabian*, 24 F.3d at 361; *see Tuchman*, 14 F.3d at 1070 (holding that corporate mismanagement does not give rise to a Rule 10b–5 claim). Moreover, Rule 9(b) (and now, the PSLRA) strikes a balance between the costs of losses to investors and of baseless lawsuits to publicly-traded companies. *See Shields*, 25 F.3d at 1130 (pre-PSLRA case) ("While some fraud may go unpunished as a result of Rule 9(b)'s heightened pleading standard, we recently acknowledged that we cannot eliminate all opportunities for 'unremedied fraud' without creating opportunities for 'undeserved settlements.'" (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 263–64 (2d Cir.1993)). This court's careful review of plaintiffs' amended complaint leads it to conclude that plaintiffs have failed to allege a strong inference of fraud. *See Maldonado*, 137 F.3d at 10 ("When we examine these pleadings carefully, we find that there are no specific allegations of fact which strongly imply a fraudulent intent.").

\* \* \* \* \* \*

---

**27.** This sympathy is tempered somewhat, at least with respect to plaintiff MII. MII purchased 365,200 shares of Heartland stock between December 18, 1996 and February 28, 1997. Am.Compl. ¶ 22. MII made its first purchases December 18, 1996 at 13⅞ per share (5,200 shares) and 14⅛ per share (10,000 shares). But it made its largest single purchase, and acquired most of its shares, on February 28, 1997, when it bought 225,000 shares at 3 ⅝, 25,000 shares at 3¹¹/₁₆, and 50,000 shares at 3 ¾. In other words, MII acquired 82% of its Heartland shares *after* the stock had declined in price from over $14.00 per share to under $4.00 per share in a two-month period.

The court grants defendants' motion to dismiss. Plaintiffs shall have 45 days from the date this opinion is filed in which to file an amended complaint that complies with the PSLRA and Rule 9(b).

**SO ORDERED.**