**In re CDNOW, INC. SECURITIES LITIGATION.**

**This Document Relates to: CIV.A. 00 CV 4742, CIV.A. 00 CV 4559, CIV.A. 00 CV 4920, CIV.A. 00 CV 4572, CIV.A. 00 CV 5221.**

**Nos. CIV.A. 00 CV 4290,**

United States District Court,
E.D. Pennsylvania.

April 10, 2001.

---

Susan R. Gross, Law Offices of Bernard M. Gross, P.C., Philadelphia, PA, Jill Abrams, Abbey, Gardy & Squitieri, LLP, Lawrence E. Fenster, Ross & Hardies, New York City, for Plaintiffs.

Marc J. Sonnenfeld, Karen Pieslak Pohlmann, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Defendants.

Jill Abrams, Abbey, Grady & Squitieri, LLP, New York City, Eugene A. Spector, Spector, Roseman & Kodroff, P.C., Philadelphia, PA, Lawrence E. Fenster, Ross & Hardies, New York City, Stuart L. Berman, Robert B. Weiser, Schiffrin & Barroway, LLC, Bala Cynwyd, PA, for Movants.

## MEMORANDUM & ORDER

KATZ, Senior District Judge.

The above-captioned actions, each of which allege security fraud by defendant CDnow, Inc. and several of its officers, have been consolidated into a putative class action. Now before the court is the defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and for failure to plead fraud with sufficient particularity under Rule 9(b) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 et seq. (PSLRA).

### I. Background [1]

At the heart of plaintiffs' complaint is the contention that defendants failed to disclose, publicly and in a timely manner, the fact that its independent auditors, Arthur Andersen, would issue a report "rais[ing] substantial doubt about [CDnow's] ability to continue as a going concern." Def. Mot. Dismiss Ex. E at 28; see also, e.g., Corrected Consol. and Am. Class Action Compl. (Compl.) ¶ 64. According to plaintiffs, "[a] 'going concern' qualification alerts the reader that the existence of the company for one year is in doubt. . . . [It] constitutes a conspicuous

'red flag' being waved by the auditor which reflects that the Company is on the verge of bankruptcy[.]" Id. ¶ 59.[2]

### A. Parties

Plaintiffs bring this action on behalf of themselves and a putative class who purchased CDnow securities from February 13, 2000, to March 28, 2000.

Defendant CDnow is a Pennsylvania corporation that sells CDs and other music related products online. Its derives its revenue from the sale of those products, as well as from selling advertising on its internet website. The individual defendants are: Jason Olim, CDnow's co-founder and the President and CEO during the relevant time period; Joel Sussman, CDnow's Vice President and CFO during the relevant time period; John Regan, a CDnow director and Audit Committee member during the relevant time period; and Patrick Kerins, a CDnow director until his June 14, 2000, resignation and Audit Committee member during the relevant time period. According to the plaintiffs, until the company's August 2000 merger with Bertelsmann, Inc., Olim owned 2,960,025 shares of CDnow's common stock, representing nine percent of the company, and Sussman owned 37,731 shares of CDnow's common stock or warrants.

### B. The Sony/Time Warner Merger Agreement and the Termination Agreement

On July 13, 1999, CDnow, Sony Corporation of America (Sony) and Time War-

---

**1.** All facts in this section are taken from the Corrected Consolidated and Amended Class Action Complaint (Compl.) or materials that are explicitly relied upon, or integral to, the complaint. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997).

**2.** These allegations are the bases for Counts I and II. Count III alleged that the defendants violated section 14(e), 15 U.S.C. § 78n(e), by filing a materially false and misleading Schedule 14D–9 in connection with Bertelsmann Inc.'s tender offer. By letter, filed by Order of April 2, 2001, plaintiffs withdrew count III.

ner, Inc. announced that they had entered into a merger agreement the previous day. The merger would have combined the businesses of CDnow and Columbia House,[3] which is equally owned by Sony and Time Warner. The new company formed by the merger would have been owned 26% by CDnow shareholders, 37% by Sony, and 37% by Time Warner. Columbia House and CDnow were to become wholly-owned subsidiaries of the new company.

The merger agreement provided that

CDnow has no liabilities or obligations required by GAAP to be disclosed in its balance sheets or the notes thereto, that could be reasonably expect to have a 'Material Adverse Affect.' (defined as being on the business, assets, condition ... or results of operations of such party.)

Compl. ¶ 33 (quoting merger agreement § 3.06). The agreement required CDnow to give Sony and Time Warner a comfort letter from Andersen and provided that CDnow would receive the same letter from Columbia House's independent auditors. Additionally, the agreement gave Time Warner and Sony access to CDnow's books and gave CDnow access to Columbia House's books. With regard to any public announcements regarding the pending merger, the agreement required that

Time Warner and Sony, on the one hand, and CDnow, on the other hand, shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to the Transactions, and CDnow shall not issue any such press release or make any such public statement without the prior approval of each of Time Warner and Sony.

Id. ¶ 38 (quoting merger agreement § 8.08). Also in connection with the merger agreement, Time Warner and Sony agreed to lend CDnow up to $30 million beginning on December 15, 1999, in order to provide CDnow with sufficient working capital while the merger was pending.

The agreement provided that either Time Warner and Sony, on the one hand, or CDnow, on the other hand, could terminate the merger if it was not consummated by March 13, 2000. Prior to that date, the merger could only be terminated by mutual consent of all parties or because of a breach by a party. Id. ¶ 41 (citing Article X of the merger agreement).

The merger was not, in fact, completed by the drop dead date. On March 13, CDnow, Sony, and Time Warner entered into a termination agreement under which Sony and Time Warner agreed to purchase a total of 2,405,500 shares of CDnow common stock for $21 million and to replace Time Warner and Sony's $30 million short-term loan commitment with $30 million of long-term debt, convertible at the holder's option of $10 per share. The stock purchase was completed on March 16, 2000, Def. Mot. Dismiss Ex. E at 32; as of that date, CDnow had borrowed $20 million under the convertible loan. Id. at 39. Although the merger agreement did not require any payment from Time Warner and Sony if the merger was mutually terminated, plaintiffs allege that the two companies purchased the CDnow stock "in order to protect their existing investment in CDnow and to be released from the Merger Agreement." Compl. ¶ 52.

C. CDnow's 1999 Financial Statements and Andersen's Report

Andersen completed its field work for its 1999 audit of CDnow's on January 28,

---

3. Columbia House is "the leading club-based retailer of music and videos." Compl. ¶ 29.

1999. Less than a week later, on February 3, 2000, CDnow issued a press release reporting its fourth quarter revenues, as well as its full-year 1999 revenues. In the release, the company reported a net loss of $25.7 million for the fourth quarter and $119.2 million net loss for 1999. Def. Mot. Dismiss Ex. B. Attached to the release was CDnow's Condensed Consolidated Balance Sheets for 1999 and 1998, as well as its Consolidated Statements of Operations for the fourth quarters of 1999 and 1998 and the full years 1999 and 1998. *Id.* These figures revealed that the company had a working capital deficit of $32.7 million by the end of December 31, 1999; that over the past year, its cost of sales increased 161%, from $45.35 million in 1998 to $118 million in 1999; and that its overall operating expenses nearly tripled, from over $57 million in 1998 to $150.7 million in 1999. *Id.;* Compl. ¶ 61. The figures set forth in the balance sheets and statements of operations are identical to those set forth in Andersen's report on its independent audit. *Compare* Def. Mot. Dismiss Ex. B *with* Def. Mot. Dismiss Ex. E at 28–30.

Andersen's audit report is dual-dated: it bears the date of January 28, 2000, except

for matters related to the going concern qualification, which is dated March 16, 2000.[4] Andersen's report, including the qualification, was publicly released when CDnow attached the report to the Form 10–K it filed with the SEC on March 28, 2000.

### D. Plaintiffs' Allegations

Plaintiffs contend that once Andersen completed its 1999 audit of CDnow, defendants knew that the company could not survive—and that Andersen would issue the going concern qualification—unless it merged with another entity. Plaintiffs allege that by February 13, 2000, defendants

> knew that the Merger could not be consummated because Columbia House's cash flow, combined with CDnow's true financial condition, could not support the merged entity. Knowing that the Merger would not occur, and that it had no available alternative that would avoid a 'going concern' qualification by Andersen, CDnow chose to keep its financial crisis quiet throughout the Class Period while investors poured money into CDnow shares. Those statements defendants chose to make falsely led inves-

---

**4.** According to the complaint, Andersen dated the qualification March 15, 2000. *See, e.g.,* Compl. ¶ 62. Plaintiffs appear to stand by this date, *see* Pl. Mem. in Opp. at 1 n. 3, although they concede that the discrepancy in dates is "not material to this motion." *Id.*

The court finds that the earliest the qualification could have been dated is March 16, 2000, since the qualification is clearly dated such in the Report of Independent Auditors, *see* Def. Mot. Dismiss Ex. E at 28 (dating the report January 28, 2000, "except with respect to matters discussed in Note 1, as to which the date is March 16, 2000"; stating that, as discussed in Note 1, Andersen has "substantial doubt" about CDnow's ability to continue as a going concern), and since the qualification discusses events that occurred on March 16, 2000, in the past tense. *See also id.* at 32.

The court makes this finding at this stage in the proceedings given that plaintiffs admit that the date discrepancy is not material and do not question the authenticity of Report of Independent Auditors attached to the defendants' motion as Exhibit E. *See In re Burlington,* 114 F.3d at 1426 (holding that the court may consider an undisputably authentic document without converting a motion to dismiss into a summary judgment motion if the document is integral to or explicitly relied upon in the complaint).

Defendants argue that since events on March 16 are discussed in the past tense, that necessarily implies that the report was prepared after that date. Because the court is ruling on a motion to dismiss, it declines to find that the report was prepared after March 16, 2000, at this juncture in the litigation.

tors to believe that there was no reason the Merger would not proceed. Compl. ¶ 64. According to plaintiffs, the public was not aware of CDnow's dire financial straits because

> [t]he information that leads to the issuance of a 'going concern' qualification can only be truly known by those with full access to a company's complete financial records, *i.e.*, its executives and accountants. Factors such as new contracts or other such relevant information can not necessarily be discerned by the public documents filed with the Securities and Exchange Commission and/or disseminated by public companies.

*Id.* ¶ 59.

Plaintiffs further allege that once the merger terminated, defendants Olim and Sussman made materially misleading statements that "continued to mislead the public into believing that the termination was beneficial to CDnow and that it could survive in its existing financial condition." *Id.* ¶ 64. According to the complaint, the remaining individual defendants "stood mute, despite their duty to disclose." *Id.*

Most significant of Olim's alleged post-termination misstatements[5] is the one he made on March 13, 2000, to the daily newspaper *Newsday* that " 'When we entered the merger we expected Columbia House to have the cash flow to drive our growth.... We all found out about 30 days ago that Columbia House didn't have the cash flow position that we thought it had.' " *Id.* ¶ 51. This statement appears to be the basis for the class period start

date of February 13, 2000: plaintiffs' theory is that once CDnow received Columbia House's financial data, that information, combined with CDnow's knowledge of its own finances, gave rise to a duty by CDnow to disclose that the merger would not take place and, as a result, Andersen would officially pronounce that CDnow's ongoing existence was tenuous.

The complaint also sets forth other alleged materially misleading statements. Plaintiffs take issue with statements in a March 13, 2000 report by Dow Jones News Service:

> 'CDnow said that merger termination was the best move for the company and its shareholders' and 'Jason Olim said the merger with Columbia House fell apart because it didn't make financial sense to his company.' Olim was quoted as stating 'we expected Columbia House to have adequate cash flow to fund the growth of the company' and that Columbia House's cash flows and debt level 'are not what they were at the time of the agreement.'

*Id.* ¶ 53. In an interview with the *Hollywood Reporter* that appeared on March 14, 2000, Olim said "that CDnow was disappointed the merger would not go through[.] 'However, we feel the termination of the merger is the best move for CDnow and its shareholders.' " *Id.* ¶ 55. In an March 15, 2000 article in the *Philadelphia Inquirer*, Olim

> was quoted as saying 'Ultimately, CDnow as a stand alone entity is not

---

5. The complaint points to only one allegedly misleading pre-termination statement. The February 3, 2000 press release announcing CDnow's fourth quarter 1999 revenues, included the statement that "[t]he company anticipates that the merger will close in the second quarter of 2000, following receipt of regulatory approval from the FTC, clearance from the SEC, and shareholder approval."

Def. Mot. Dismiss Ex. B; Compl. ¶ 49. Plaintiffs allege that at the time this statement was made, the "defendants were aware that, absent the Merger, CDnow would be unable to survive the year." Compl. ¶ 50. Since the putative class period does not start until February 13, 2000, this statement does not subject the defendants to liability.

going to create the same amount of value' as a combined company, but that the Company would 'absolutely survive without a partner.' He added, 'All in all, we're very comfortable that we have a viable plan to move forward.'

*Id.* ¶ 56. Finally, while not pointing to any specific statements, plaintiffs allege that during a March 13, 2000 teleconference Olim reiterated that the merger terminated due to Columbia House's poor financial condition and that while Olim and Sussman discussed CDnow's financial condition, "[a]t no time did they disclose CDnow's dire financial straits or the fact that CDnow would receive a 'going concern' qualification from Andersen without the Merger." *Id.* ¶ 54.

In July 1999, when the merger was announced, CDnow's stock price was $22–1/4 per share. Its stock price on March 10, 2000, the last trading day before the March 13, 2000 merger agreement termination announcement, was $9–7/16 per share. The price had dropped to $6–31/32 per share by close of trading on March 14, 2000. The price dropped again to its 52–week low of $3–1/2 per share closing price on March 29, 2000, the day after Andersen's going concern qualification was filed with the SEC.

## II. Discussion

### A. Section 10(b) and Rule 10b–5

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5(b), create "liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." [6] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997).

■ In order to establish a cause of action under section 10(b) and Rule 10b–5, a plaintiff must show that the defendant "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." *Id.* A plaintiff must also establish that the defendant acted with scienter and that the plaintiff's reliance caused him or her injury. *Id.; see also, e.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 (3d Cir.1992) ("To state a claim under section 10(b) and Rule 10b–5, a private plaintiff must plead (1) a false representation of (2) a material (3) fact, (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss."). Finally, the plaintiff's pleadings must satisfy the heightened standards set forth in PSLRA, and Federal Rule of Civil Procedure 9(b). *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530–31 (3d Cir.1999).

In essence, the bases for the plaintiffs' section 10(b) and Rule 10b–5 allegations can be separated into three distinct time periods, each of which alleges a slightly different theory of culpability. First, plaintiffs assert that from February 13 to

---

**6.** Section 10(b) prohibits the

use or employ[ment], in connection with the purchase or sale of any security registered on an national security exchange . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

Rule 10b–5 makes it illegal

[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]

17 C.F.R. § 240.10–b5(b).

March 13, 2000, the defendants knew (a) that the merger with Columbia House would not be consummated because by that date they possessed non-public information about the precarious financial conditions of both Columbia House and CDnow and, consequently, (b) that Andersen would issue a going concern qualification because CDnow could not sustain itself through the year without a merger. Accordingly, plaintiffs claim that the defendants violated applicable security laws by failing to inform the public promptly that the merger was dead and that CDnow would receive the qualification. Second, from March 13, 2000, when the termination of the merger agreement was announced, until March 16, 2000, when the going concern qualification is dated,[7] plaintiffs assert that defendants (a) again failed to inform the public of the inevitability of a going concern qualification and (b) affirmatively misled the public regarding the true reason why the merger was unsuccessful. Pl. Mem. in Opp. at 11–13. Third, from March 16 to March 28, 2000, when Andersen's audit report was filed with the SEC, plaintiffs allege that defendants failed to disclose publicly that Andersen issued the qualification. *Id.* at 8–9, 14.[8]

### 1. Dismissal Under Rule 12(b)(6)

The court dismisses for failure to state a claim upon which relief can be granted the portions of the complaint that allege section 10(b) and Rule 10b–5 violations for defendants' failure to disclose the merger termination and Andersen's alleged intent to issue a going concern qualification from the start of the class period until March 16, 2000. "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington,* 114 F.3d at 1420. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In ruling on the motion to dismiss, a court is not, however, required to credit bald assertions or legal conclusions contained in the complaint. *In re Burlington,* 114 F.3d at 1429–30.

### a. Material Omissions

Plaintiffs' claims regarding the merger termination and the going concern qualification fail as a matter of law because the defendants had no duty to disclose that the merger would fail and they would receive the qualification before it was certain that these events would occur, and because these omissions are immaterial. The court finds three independent bases for dismissing the claims for the period from February 13 to March 13: 1) because the termination of the merger was not certain until the drop dead date, the defendants had no duty disclose the merger's failure before that date; 2) because CDnow's receipt of a going concern qualification was not certain

---

**7.** As discussed in greater detail in section II.A.2.a.2, the complaint only alleges when the qualification was dated, not when Andersen prepared and issued it or when defendants knew that Andersen had done so. For purposes of analyzing plaintiffs' section 10(b) and Rule 10b–5 claims under Federal Rule 12(b)(6), the court assumes that the operative date in terms of Andersen's final decision to officially signal its doubts regarding CDnow's

ability to continue as a going concern is March 16, 2000.

**8.** Plaintiffs make this argument explicitly only in their Memorandum in Opposition to defendants' motion. As discussed in greater detail in section II.A.2.a.2, plaintiffs do not adequately plead their claim regarding the period of March 16 to March 28, 2000.

until Andersen's report was issued, the defendants had no duty to disclose that they would receive the qualification; and 3) both of these omissions are immaterial because they concern speculative and contingent events. With regards to the period from March 13 to March 16, the court dismisses the· claims under the latter two bases only.

### 1. Termination of the Merger Was Not Certain Until the Drop Dead Date

█ The court finds as a matter of law that defendants are not liable for failing to inform the public that the merger would not go through. A corporation is not required to disclose a fact merely because a reasonable investor would like to know that fact. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993). "Rather, an omission is actionable under the securities law only when the corporation is subject to a duty to disclose the omitted fact." *Id.; see also Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5.").

█ Under the facts and circumstances of this case, the merger termination was not certain until March 13 and, therefore, defendants had no duty to inform the public that the deal was dead prior to that date. The plaintiffs' argument is that defendants had certain knowledge of the merger's failure prior to the public announcement, not that the defendants had a duty to disclose the possibility that the merger would not take place.[9] In support their contention, plaintiffs repeatedly allege that defendants knew that the merger would fail. The court need not, however, accept unsupported and conclusory allegations in ruling on a motion to dismiss. *See*

*Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) ("Although for the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation."); *In re Burlington,* 114 F.3d at 1429–30 ("In deciding a motion to dismiss, a court must take well-pleaded facts as true, but need not credit a complaint's bald assertions or legal conclusions.") (citations, punctuation omitted). Accordingly, "factual allegations must be true to provide a basis for a cause of action, ... hyperbole and speculation cannot give rise to a claim of securities fraud." *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 615 (4th Cir.1999).

Plaintiffs do not posit anything other than a conclusory allegation in support of their theory that defendants knew that the merger would not take place before March 13. Even viewed in a light most favorable to plaintiffs, Olim's statements that "When we entered the merger we expected Columbia House to have the cash flow to drive our growth" and that "We all found out about 30 days ago that Columbia House didn't have the cash flow position that we thought it had," Compl. ¶ 51, upon which plaintiffs base their claim that defendants had certain knowledge, simply do not provide a sufficient factual basis to support this allegation. These statements relate to CDnow's view of Columbia House's financial position on or about February 13. They do not, however, stand for the proposition that CDnow knew the merger would not be consummated at that time. In interpret Olim's comments as such, the plaintiffs ask the court to do more than draw a reasonable inference.

**9.** The court expresses no opinion regarding whether and under what circumstances a duty to disclose the possibility of a merger's termination would arise.

Rather, plaintiffs ask the court to import wholly new meaning into the statements.

In arguing that defendants' knowledge was certain, the plaintiffs ignore that the success or failure of the merger was also dependent on two other companies—Sony and Time Warner—making their own evaluations of the transaction's desirability. Plaintiffs do not suggest in their pleadings that the other parties to the transaction viewed the deal as dead prior to March 13; the court, therefore, does not accept plaintiffs' allegation that the merger's termination was certain before the agreement's drop dead date. *See Papasan,* 478 U.S. at 286, 106 S.Ct. 2932 (refusing to credit plaintiffs' allegation that they were deprived of a minimally adequate education because the plaintiffs "allege[d] no actual facts in support of their assertion.").

Furthermore, the limited factual allegations in the complaint regarding the role of Sony and Time Warner suggest that the likelihood of the merger's success was not something that CDnow could independently ascertain or publicize until the drop dead date. Before March 13, CDnow could only terminate the merger agreement with the consent of Sony and Time Warner, or because of a breach by the other parties. Compl. ¶ 41. The plaintiffs do not suggest in the complaint that Sony and Time Warner were agreeable to an early termination of the merger or that the two companies were in breach of the merger agreement. In addition, the agreement required the three companies to consult with each other before disseminating any press release or public statement regarding the pending transaction and specifically forbade CDnow from issuing any statement or release without the approval of both Sony and Time Warner. Compl. ¶ 38. These provisions in the agreement support

the conclusion that the success or failure of the merger was a trilateral determination. If the plaintiffs' unsupported allegation that the merger was clearly dead before March 13 is excluded from the complaint, then the complaint fails as a matter of law: if the merger's termination was uncertain, there is no duty by defendants to disclose that the deal would not be consummated.

2. The Going Concern Qualification Was Not Certain Until Andersen Issued Its Report

■ Similarly, the court finds as a matter of law that, under the facts and circumstances of this case, the defendants did not have a duty to disclose that they might receive a going concern qualification prior to Andersen issuing one.[10] Again, plaintiffs do not argue that defendants had a duty to disclose the possibility that CDnow would receive a qualification, but rather that defendants had certain knowledge that Andersen would issue one.

Plaintiffs' assertion that the defendants knew that a going concern qualification was inevitable prior to the date it was actually issued is an unsupported allegation that ignores that the final decision regarding the qualification rested with Andersen. As noted, from February 13 to March 13, the merger termination was uncertain and, under plaintiffs' theory, the qualification was also uncertain since Andersen would not have issued one if CDnow and Columbia House merged. For the period after the merger termination, the plaintiffs have alleged that CDnow was in desperate financial straits and that the defendants and Andersen were privy to non-public information regarding the company's obligations that rendered CDnow's position even more pre-

---

**10.** The parties have not cited, nor has the court's independent research found, any case

that addresses a duty to disclose the anticipated receipt of a going concern qualification.

carious. Even accepting the plaintiffs' allegations in this regard, however, court declines to view them as inexorably leading to the conclusion that a going concern qualification was inevitable prior to the date it was issued or that there was a duty to disclose that CDnow would receive a qualification prior to the issuance of the report.

In fact, allegations in the complaint support the proposition that the decision to issue the qualification was ultimately Andersen's. Plaintiffs allege that in 1996 CDnow also faced the prospect of a going concern qualification and was so informed by Andersen. "CDnow was able to identify for Andersen certain specific contracts that could be, and were promptly reworked, to reflect necessary modified terms such that Andersen did not need to issue a qualified opinion." Compl. ¶ 65. This earlier experience supports the view that a going concern qualification represents the culmination of an iterative process and ultimately reflected Andersen's interpretation of the company's financial state, rather than an unavoidable outcome that defendants must have known about

in advance. Thus, even assuming that there was communication between the defendants and Andersen regarding the *possibility* of a going concern qualification before March 16—an allegation that defendants dispute—defendants did not have a duty to disclose these discussions.[11]

The court does not mean to suggest that there can never be an instance where a company's financial prognosis is so grim that it becomes clear that the company is unlikely continue as a going concern before the auditors have officially announced the death knell. In view of the facts and circumstances alleged in this case, however, the court holds as a matter of law that Andersen's going concern qualification was not certain until the auditors issued their report.

### 3. The Omissions Were Immaterial

■■■■ In addition, the court finds that defendants' alleged omission regarding the merger termination and the going concern qualification are not material because, prior to the occurrence of each events, they were speculative or contingent.[12] An omit-

**11.** The court notes that the *Wall Street Journal* article, entitled "Going Concerns–Did Accountants Fail to Flag Problems at Dot–Com Casualties" attached to and referenced in the plaintiffs' response, supports this conclusion. *See* Pls. Mem. in Opp'n Ex. A. For example, the article notes that only three of ten publicly owned *dot-coms that failed last year received going concern qualifications, id.,* suggesting that such a qualification is not inevitable, even when a company is on shaky financial ground. The article also cited a statement of an Andersen partner that the issuance of a going concern qualification is a judgment call by the auditor. *Id.* Because the article was not mentioned in the complaint, the court does not rely on the article at this stage in the proceedings in finding that the going concern qualification was not certain until Andersen actually issued it.

**12.** Generally, there is a distinction between materiality and a duty to disclose: a fact may

be material, but if there is no duty to disclose it, then there is no liability for failing to do so. *See In re Time Warner,* 9 F.3d at 267; *see also Glazer v. Formica Corp.,* 964 F.2d 149, 157 (2d Cir.1992) (noting that other circuits have applied the distinction between materiality and the duty to disclose in the context of merger or acquisition negotiations). The Second Circuit has also recognized that in certain contexts, the materiality and disclosure inquiry coalesce. One example is "where the duty to disclose arises from the combination of a prior statement and a subsequent event, which if not disclosed renders the prior statement false or misleading[.]" *In re Time Warner,* 9 F.3d at 267. In such a case, if the omitted information is material to a reasonable investor in that he or she would view it as having significantly altered the total mix of information available, then a duty to disclose arises because disclosure of the omitted information is necessary to make the prior statement not misleading. *Id.* 267–68.

ted fact is material if there is a "substantial likelihood that a reasonable shareholder would consider it important" in deciding how to act. *Basic*, 485 U.S. at 231, 108 S.Ct. 978 (citation, punctuation omitted); *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 599 (3d Cir.2000) (citation, punctuation omitted). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic* at 231–32, 108 S.Ct. 978 (citation, punctuation omitted); *Ieradi* at 599 (citation, punctuation omitted). While materiality is traditionally a question for the trier of fact, a court may rule alleged omissions immaterial as a matter if law if the omissions are so obviously unimportant to a reasonable investor that reasonable minds cannot differ on the question of materiality. *Ieradi*, 230 F.3d at 599; *Klein v. General Nutrition Cos., Inc.*, 186 F.3d 338, 342–43 (3d Cir.1999). "[A]n omission is immaterial as a matter of law if the facts omitted would have no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings." *In re Rockefeller Ctr. Props.*, 184 F.3d 280, 289–90 (3d Cir.1999) (citation, punctuation omitted). Factors governing the materiality inquiry include "whether the information omitted is speculative or unreliable, or if it is contingent." *Id.* at 290 (citations, punctuation omitted); *see also Klein*, 186 F.3d at 343 (holding that

failure to disclose defendants' "concern" about a "potential" loss of third party advertising support was immaterial since omission addressed a contingent or speculative event).

Here, as discussed, the merger's termination prior to the drop dead date was contingent on the mutual consent of all parties, or a breach by one of the parties. Whether all three parties would have consented is purelys speculative, nor do the pleadings contain any suggestion that any party was contemplating terminating due to a breach by another party. *Cf. Basic*, 485 U.S. at 239, 108 S.Ct. 978 (holding that "[w]hether merger discussions in any particular case are material . . . depends on the facts."). Defendants, therefore, did not fail to publicize a material fact. Moreover, Andersen's qualification was not certain until, at the earliest, March 16. Accordingly, defendants' alleged failure to announce the auditor's death knell is immaterial because Andersen's final decision was speculative prior to that time.[13]

b. Allegedly Materially Misleading Statements

■ The defendants' statements regarding the merger termination were not materially misleading. Even assuming that the statements blaming the failure of the merger on Columbia House's financial troubles, while not false,[14] were misleading

---

Here, plaintiffs' theory of defendants' duty to disclose is not that the defendants were required to correct their earlier statement that the merger was expected to close in the second quarter of 2000, but that the defendants had a duty to disclose that CDnow would receive a going concern qualification. Thus, the court separates its duty and materiality inquiries.

**13.** With regard to the termination of the merger and the going concern qualification, plaintiffs argue that these events were not

speculative but certain. However, the sole basis of this argument is that the complaint alleges that the defendants knew these events would occur before they actually did. Plaintiffs' position thus assumes a premise that the court has rejected as conclusory and unsupported.

**14.** Plaintiffs do not seriously contend that statements crediting Columbia House's financial condition as a cause of termination were, in and of themselves, false. To the contrary, plaintiffs claim that the defendants' obligation

because they failed to acknowledge the role that CDnow's condition played in the termination of the merger, they were not material because they did not alter the total mix of available information. First, a reasonable investor would expect that any pronouncement by CDnow regarding the termination would focus on the weakness of its potential merger partner, rather than emphasize its own infirmity. None of the statements laid the blame exclusively at Columbia House's door. Statements such as "the merger with Columbia House fell apart because it didn't make financial sense" for CDnow, Compl. ¶ 53, and that Columbia House's cash flow and debt level failed to meet CDnow's expectations, *id.*, are not so emphatic that a reasonable investor would regard them as assurances that Columbia House was wholly responsible for the termination. *Cf. Phillips*, 190 F.3d at 616 (holding that officer's statement that company was "not for sale" was not, as plaintiffs alleged, equivalent to a blanket denial of any merger negotiations or an explicit assertion that the company was not engaged in negotiations). Second, CDnow's financial statements for 1999 were released to the public on February 3, 2000, and, if nothing else, reveal to a reasonable investor that CDnow was in serious need of positive cash flow. Thus, the investing public already had information, independent of Olim's statements, that

suggested that CDnow's condition was such that it required a strong merger partner.[15]

In particular, Olim's statement that CDnow would "absolutely survive" without a partner is not false or misleading. The March 13 termination agreement provided that CDnow would receive $21 million from Sony and Time Warner's common stock purchase and could borrow $30 million from those companies. As a result, CDnow had sufficient cash to survive past the date of the merger termination. Admittedly, this statement was not qualified by a specific period of time during which CDnow's survival was certain: the court recognizes that at some point, a period would be so brief that such a statement would be false or misleading without a qualification. In this case, however, CDnow received a commitment for a relatively hefty cash infusion that ensured its survival for a sufficient amount of time such that Olim's statement was not false or misleading.[16]

c. Dismissal Based on the February 3 or March 20, 2000 Press Releases Is Not Appropriate at This Stage in the Proceedings

Defendants, for their part, also contend that they cannot be liable for securities fraud because two press releases, one dis-

to disclose their alleged knowledge of the inevitability of a going concern qualification from February 13 to March 16 arose from their knowledge of Columbia House's financial condition combined with public and non-public information about CDnow. Put another way, the complaint acknowledges that Columbia House's situation was *a* cause of the merger termination. For purposes of resolving this motion to dismiss, the statements that laid the blame for the failure with Columbia House were not false.

15. Similarly, defendants' general statements that the termination of the merger was a

positive outcome for CDnow and that CDnow had a viable plan to move forward were puffery and not material. *In re Advanta*, 180 F.3d at 538 ("[V]ague and general statements of optimism constitute no more than puffery and are understood by reasonable investors as such.") (citation, punctuation omitted). Puffery, even if arguably misleading, does not give rise to liability under federal securities law because it is not material. *Id.*

16. Subsequent events demonstrate that Olim was correct in his assessment. CDnow remained in existence, without a partner, until its August 2000 merger with Bertelsmann.

seminated on February 3, 2000, and one disseminated on March 20, 2000, provided the public with information that was equivalent to Andersen's going concern qualification, namely that the company might not survive through the next year.

The February 3, 2000 press release contained CDnow's financial information for the fourth quarter of 1999, as well its year-end results. Andersen's audit report contains the same data, albeit with the addition of, *inter alia,* the going concern qualification. According to the defendants, because information regarding CDnow's finances were released to the investing public before the class period, the public release of Andersen's going concern qualification did not alter the total mix of available information. While CDnow's 1999 fourth quarter and year end statements indicated that the company was losing money and that it had a working capital deficit of $37.2 million, it is premature to conclude that the February 3, 2000 release of this data gave a reasonable investor essentially the same information that the going concern qualification did.

Defendants also argue that the March 20, 2000 release stating that CDnow had "sufficient cash for at least six months[,]" Def. Mot. Dismiss, Ex. D, actually provided the public with more information then did the going concern qualification. Def. Reply Mem. at 21–23. CDnow issued the release in response to an article in the March 20, 2000 edition of *Barron's* reporting that CDnow had less than one month of cash remaining. This later press release is not attached to or relied upon in the complaint, and thus, consideration of it is premature at this stage. The court declines defendants' invitation to take judicial notice of this press release.

d. Defendants' Receipt of the Going Concern Qualification

Defendants contend that the date set forth in an audit report is not necessarily the date the report is prepared or issued, and, moreover, that they did not receive Andersen's 1999 audit report until after March 16, 2000.[17] *See* Def. Reply at 19–21. Thus, defendants argue that there was no duty for them to disclose the report until they received it. However, in asserting that the report was not prepared on March 16, defendants rely on facts not contained in the pleadings nor relied upon or integral to the complaint. The court, therefore, does not resolve this issue at this stage in the litigation.

2. Dismissal Under Rule 9(b) and PSLRA

 In the alternative, the court dismisses the section 10(b) and Rule 10b–5 claim in its entirety for failure to meet the heightened pleading standards of the PSLRA and Rule 9(b).

In a pre-PSLRA case, the Second Circuit noted that the resolution of securities fraud cases requires forces courts to address the "inevitable tension between two powerful interests[.]" *In re Time Warner,* 9 F.3d at 263.

On the one hand, there is the interest in deterring fraud in the securities markets and remedying it when it occurs. That interest is served by recognizing that the victims of fraud are often unable to detail their allegations until they had have some opportunity to conduct discovery of those reasonably suspected of having perpetuated a fraud. Consistent with that interest, modern pleading rules usually permit a complaint to sur-

---

**17.** At the hearing, defense counsel represented that the defendants did not receive the audit report until March 28, 2000, the day it was filed with the SEC.

vive dismissal unless, in the familiar phrase, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

On the other hand, there is the interest in deterring the use of the litigation process as a device for extracting undeserving settlements as the price of avoiding the extensive discovery costs that frequently ensue once a complaint survives dismissal, even though no recovery would occur if the suit were litigated to completion....

[H]owever sensitively we strike the balance in a particular case, we will not avoid the risks of adverse consequences: in the aftermath of ... the dismissal of a 10b–5 suit, there will be some opportunity for unremedied fraud; in the aftermath of ... permit[ting] a 10b–5 suit to progress beyond a motion to dismiss, there will be some opportunity to extract an undeserved settlement. Unattractive as those prospects are, they neither indicate a sound basis for decision nor permit avoidance of decision.

*Id.* at 263–64.

While the PSLRA does not resolve the tension between deterring securities fraud and stymieing meritless suits, it was designed to favor the second consideration. *See Advanta,* 180 F.3d at 531 (noting that the purpose of the PSLRA "was to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of 'deep pocket' defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys"). *Cf. In re Time Warner,* 9 F.3d at 263 (pre-PSLRA, noting the difficulty of accommodating the conflicting interests in the absence of "a more refined statutory standard than the vague contours of section 10(b) or a more detailed attempt at rulemaking than the SEC has managed in Rule 10b–5[.]").

With the foregoing considerations in mind, the court dismisses, in the alternative, the section 10(b) and Rule 10b–5 claims on the following independent grounds: (1) failure to plead material omissions and materially false or misleading statements adequately; and (2) failure to plead scienter adequately.

The Third Circuit recently set forth an overview of the interplay between the elements of a section 10(b) and rule 10b–5 violation and the post-PSLRA applicable pleading standards.

The Reform Act requires a plaintiff alleging a Rule 10b–5 violation to

specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C.A. S 78u–4(b)(1) (West Supp. 1999). Regarding scienter, or knowledge, section 21D(b)(2) of the Reform Act provides:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*Id.* § 78u–4(b)(2). Failure to meet these requirements will result in dismissal of the complaint. *See id.* § 78u–4(b)(3)(A). Complaints alleging securities fraud must also comply with Rule 9(b), which provides: 'In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.' Fed. R.Civ.P. 9(b).

*In re Advanta,* 180 F.3d at 530–31 (footnotes omitted).[18] In other words, under Rule 9(b) and the PSLRA, a pleading must set forth the "who, what, when, where, and how: the first paragraph of any newspaper story." *Id.* at 534 (citations, punctuation omitted).

### a. Allegedly Material Omissions and Materially False or Misleading Statements

#### 1. February 13 to March 16, 2000

In the alternative to dismissal under Rule 12(b)(6), the claims regarding defendants' alleged material omissions are dismissed for failure to plead adequately under Rule 9(b) and the PSLRA for the reasons set forth in parts II.A.1.a and II.A.1.b of this opinion. The complaint lacks non-conclusory and supported allegations that the merger was certain to terminate before March 13 and that Andersen would inevitably decide to issue the going concern qualification before March 16. Morever, the complaint lacks non-conclusory and supported allegations that defendants' statements were materially false or misleading.

The court disagrees with plaintiffs that, under the Third Circuit's relaxed pleading standard for material exclusively within the control of the defendant, the complaint contains sufficient specific allegations to survive dismissal under Rule 9(b). *See, e.g., In re Burlington,* 114 F.3d at 1418 (pre-PSLRA, holding that because the application of Rule 9(b) prior to discovery may allow "sophisticated defrauders to successfully conceal the details of their fraud . . . [,] the normally rigorous particularity rule has been relaxed somewhat where the factual information is perculiarly within the defendant's knowledge or control.") (citations, punctuation omitted). "Even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.; In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 935 (D.N.J.1998). Thus, even assuming that this relaxed standard survives the PSLRA, the factual allegations in the complaint are so conclusory, as discussed previously, that they are therefore inadequate.

#### 2. March 16 to March 28, 2000

In light of the foregoing, the complaint fails to allege any facts regarding the date the going concern qualification was actually prepared and issued or the date that the defendants had knowledge that the Andersen had done so. The complaint simply states that Anderson's audit report is "dated 'January 28, 2000 (except with respect to matters discussed in Note 1, as to which the date is March 15,[19] 2000.')" Compl. ¶ 62. Plaintiffs do not, however, plead any

---

**18.** In *Advanta,* the Third Circuit also noted that the conflict between "Rule 9(b)'s provision allowing state of mind to be averred generally" and "the Reform Act's requirement that plaintiffs state with particularity facts giving rise to a strong inference of scienter" and concluded that "the Reform Act super-

sedes Rule 9(b) as it relates to Rule 10b–5 actions." *In re Advanta,* 180 F.3d at 531 n. 5.

**19.** As noted previously, the court finds that the qualification is actually dated March 16, 2000.

facts regarding the date the report was prepared and/or issued by Andersen. As discussed previously, plaintiffs' factual allegations regarding defendants' certain knowledge of the qualification prior to March 16 are not credited by the court because they are conclusory and unsupported. Without those allegations, the complaint is devoid of any facts regarding the who, what, when, where, and how of the defendants' alleged knowledge that Andersen decided to issue the qualification. Accordingly, that portion of the section 10(b) and Rule 10b–5 claim based on defendants' failure to inform the public of the going concern qualification for the period of March 16 to March 28 is dismissed because it has not been adequately pled.

### b. Scienter

■■■■ As another independent basis, the claims are dismissed for failure to plead scienter adequately. In this Circuit, scienter may be plead by (1) "by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior," or (2) "alleging facts establishing a motive and opportunity to commit

fraud." *In re Advanta,* 180 F.3d at 534–35 (citation, punctuation omitted); *see also Press v. Chem. Inv. Serv. Corp.,* 166 F.3d 529, 538 (2d Cir.1999); *In re Resource Am. Sec. Litig.,* No. CIV. 98–5446, 2000 WL 1053861, at *5 (E.D.Pa. July 26, 2000). Allegations of scienter "must be supported by facts stated with particularity and must give rise to a strong inference of scienter." *In re Advanta,* at 535 (citation, punctuation omitted).[20]

#### 1. Recklessness or Conscious Wrongdoing

Plaintiffs have not adequately alleged recklessness or conscious misbehavior. "A reckless statement [or omission] is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta,* 180 F.3d at 535 (citations, punctuation omitted). Scienter may also be pled "by stating with particularity facts giving rise to a strong inference of conscious

**20.** The circuits have split on the issue of whether scienter may be pled by alleging motive after the enactment of the PSLRA. The Sixth Circuit declined to follow *Advanta,* holding that simply "alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud" does not satisfy the pleading standards of the PSLRA. *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 551 (6th Cir.1999). The *Comshare* court acknowledged that scienter may be adequately pled where a plaintiff alleged facts demonstrating motive and opportunity that "simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind." *Id.* However, allegations of motive and opportunity, in and of themselves, do not establish scienter. *Id.; see also Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1286 (11th Cir.1999) (following the Sixth Circuit in rejecting motive and opportunity pleading; holding that "the statutory language [of the

PSLRA]—'required state of mind'—plainly does not refer to motive and opportunity, because motive and opportunity do not constitute a state of mind."); *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 974 (9th Cir.1999) (applying a stricter standard than the Sixth Circuit in holding that while "facts showing mere recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable inference of intent, they are not sufficient to establish a *strong* inference of deliberate recklessness."). *Cf. Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir. 2000) (acknowledging Second Circuit precedent that pleading either recklessness or motive and opportunity is sufficient, but stating that "we believe that Congress's failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard.").

wrongdoing, such as intentional fraud or other deliberate illegal behavior." *Id.* When a complaint " 'fails adequately to allege that defendants' statements were [materially] false (affirmatively or through omissions), the [c]omplaint obviously fails to allege facts constituting circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making statements.' " *Phillips,* 190 F.3d at 621 (quoting *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co.,* 75 F.3d 801, 813 (2d Cir.1996)) (modifications in original); *see also Advanta,* 180 F.3d at 539 ("It is well established that a pleading of scienter may not rest on a bare inference that a defendant must have had knowledge of the facts.") (citation, punctuation omitted). As discussed previously, the court holds that the plaintiffs have not adequately pled that the defendants made material omissions or materially misleading statements. Therefore, plaintiffs have failed to allege facts of recklessness or conscious misbehavior.

### 2. Motive and Opportunity

Plaintiffs do not adequately plead motive.[21] According to the plaintiffs, the defendants concealed CDnow's true financial condition in order to "artificially inflate and maintain the market price of CDnow securities to create the illusion of a viable company so that CDnow could seek out another merger partner and keep CDnow's stock price as high as possible while doing so." Compl. ¶ 72. With regard to the individual defendants, plaintiffs allege that they benefitted from their allegedly deceptive acts because the company and its management team remained in existence after the merger with Bertelsmann. *Id.* ¶ 69. Plaintiffs also allege that Sussman

will receive an $182,000 bonus for remaining with the merged company, *id.,* and that Olim and Sussman "owned a large amount of CDnow stock and . . . had a particular interest in maintaining CDnow's trading price." *Id.* ¶ 72.

In order to demonstrate motive, a plaintiff must show concrete benefits that could be realized as a result of a defendant's deceptive practices. *Phillips,* 190 F.3d at 621. Alleging facts "that lead to a strained and tenuous inference of motive is insufficient to satisfy" Rule 9(b) and the PSLRA. *Id.* (citation, punctuation omitted). The court finds two independent grounds on which to hold that the allegation that defendants were motived by a desire to prop up CDnow's stock price in order to appear attractive to a potential merger partner is not adequately pled.

First, the court is persuaded by *Coates v. Heartland Wireless Communications, Inc.,* 55 F.Supp.2d 628, 643 (N.D.Tex.1999) (*Coates* II), that plaintiffs' theory of motive is "not plausible as pleaded." In *Coates* II, the alleged motive for the concealment of the Heartland's true financial condition was that the company's artificially inflated stock price would attract a potential acquisition candidate. *Id.* The court held that this motive "defies common sense" since it assumed that a sophisticated buyer would do little or no due diligence before acquiring a company like Heartland. *Id.* The same reasoning applies to the motive alleged here: it is illogical to assume that the defendants' alleged concealment of CDnow's financial difficulties would survive any serious scrutiny by a potential merger partner.[22]

Second, as defendants argue, this alleged motive would only give defendants a

---

**21.** Defendants do not seriously dispute that they had opportunity to commit the fraudulent acts alleged in the complaint.

**22.** In general, the cases plaintiffs cite in support of their motive theory are not persuasive to the extent that they are at odds with the presumption of due diligence expressed in

very brief window—after the March 13 termination of the Columbia House merger and before the March 28 public release of the going concern qualification—in which to appear attractive to potential partners. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994) (holding that motive was inadequately pled where reviews done in ordinary course of bank business would reveal non-performing loans and any alleged concealment of these loans prior to these reviews provided only "a short respite from an inevitable day of reckoning."). Thus, the plaintiffs' motive theory is inadequate as it rests on strained and tenuous inferences.

Plaintiffs' allegations regarding the individual defendants' motives are also insuffi-

cient. "[C]atch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient" to survive the post-PSLRA pleading standard. *In re Advanta*, 180 F.3d at 535. The complaint posits only the general and inadequate claim that the individual defendants benefitted the alleged fraud by retaining their positions with the company, even after its merger with Bertelsmann. *Phillips*, 190 F.3d at 622, 623 (allegations that an executive or officer committed fraud in order to retain position or retain position with merged company does not adequately plead motive because such a motive arises in every merger situation); *Shields*, 25 F.3d at 1130 ("[A] plaintiff must do more than merely charge that

---

*Coates* II. *See, e.g., Gross v. Medaphis Corp.*, 977 F.Supp. 1463, 1472 (N.D.Ga.1997).

Additionally, *Marra v. Tel–Save Holdings, Inc.*, Master File No. 98–3145, 1999 WL 317103, at *9–10 (E.D.Pa. May 18, 1999), is distinguishable in that plaintiffs there alleged artificial inflation of defendant's stock in order for the defendant acquire Compco, Inc., and to facilitate a merger with Shared Technologies Fairchild, Inc., rather than posit only vague and general assertions regarding unidentified, hypothetical potential partners, as plaintiffs have done here. Similarly, in *Coates* I, the court found plaintiffs did not plead scienter adequately because they failed to allege "any facts that the defendants were acquiring other companies or planning such acquisitions." *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910, 919 (N.D.Tex.1998).

Other cases cited simply do not support plaintiffs' position. In *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F.Supp.2d 1324, 1339 (N.D.Ga.1998), the court held that scienter could not be pled by alleging motive and opportunity, and, therefore, the case does not stand for the proposition for which plaintiffs cite it. Likewise, the court in *Harvey M. Jasper Retirement Trust v. Ivax Corp.*, 920 F.Supp. 1260, 1268 (S.D.Fla.1995), did not apply a motive and opportunity analysis in determining whether scienter was adequately pled; that case also does not stand for the

proposition for which plaintiffs cite it. *See Ivax* at 1268 ("It is sufficient if plaintiffs allege ... that the defendants were aware of, or in fact caused, the acts and omissions that form the basis of the fraud claim, or if facts from which defendants' recklessness or awareness can be inferred in order to establish scienter.").

Finally, in *In re Time Warner*, plaintiffs' theory of motive was simply more plausible than the one alleged here. That case involved defendant Time Warner's attempt to manage over $10 billion worth of debt incurred by Time Inc.'s merger with Warner Communications. Time Warner first attempted to find strategic partners "who would infuse billions of dollars of capital into the company." *In re Time Warner*, 9 F.3d at 262. When Time Warner failed to attract enough wealthy partners, the company then raised capital through a new stock offering. *Id.* Plaintiffs alleged that the defendants deliberately concealed that the search for strategic partners was not as fruitful as anticipated and that defendants were actively considering a new rights offering. *Id.* The court found that "with all inferences drawn in favor of the plaintiffs, it is arguable that defendants acted in the belief that they could reduce the degree of the dilution" caused by the stock offering if they assumed that the artificial inflation of the stock would not be completely dissipated by the announcement of the offering. *Id.*

executives aim to prolong the benefits of the positions they hold."). There are no allegations that any individual defendant benefitted from the alleged fraudulent inflation of stock prices by selling any CDnow shares, let alone a notable quantity of shares.[23] *Cf., Advanta,* 180 F.3d at 540 (holding that stock sales that are unusual in scope or timing may support a inference of scienter); *see Oran v. Stafford,* 226 F.3d 275, 289 (3d Cir.2000) (affirming dismissal of claims against individual defendants who did not trade any stock during the relevant period). The complaint contains only inadequate allegations of motive as to the individual defendants.

### c. Failure to Identify Sources

Defendants contend that the complaint should also be dismissed because plaintiffs have failed to reveal the sources of their allegations regarding the certainty of the merger termination and the certainty of the going concern qualification, as required by the PSLRA. Plaintiffs respond by arguing that they have identified the sources of all the alleged misstatements set forth in the complaint. Because the court dismisses plaintiffs' claims on other grounds, it does not resolve the question of whether the complaint sufficiently identifies plaintiffs' sources.

### B. Section 20 Claim

 Section 20 creates liability for controlling persons.[24] 15 U.S.C. § 78t(a); *see also In re Burlington* at 1414. The elements of a section 20(a) claim are: (1)

an underlying violation by a controlled person or entity; (2) a controlling person; and (3) culpable participation in the fraud by the controlling person "in some meaningful sense." *In re Cendant Corp. Sec. Litig.,* 81 F.Supp.2d 550, 558 (D.N.J.2000); *In re Equimed, Inc. Sec. Litig.,* No. 98 CV 5374 NS, 2000 WL 562909, at *10 (E.D.Pa. May 9, 2000). The heightened pleading standards of the PSLRA apply in so far as "a plaintiff must plead the particularized facts of the controlling person's conscious misbehavior as a culpable participant in the fraud." *In re Cendant Corp. Sec. Litig.,* 76 F.Supp.2d 539, 549 n. 5 (D.N.J. 1999). *But see In re Tel–Save,* No. 98 CV 3145, 1999 WL 999427, at *6 (E.D.Pa. Oct. 19, 1999) (holding that the heightened pleading requirements of Rule 9(b) do not apply to a claim under section 20(a)).

 "[O]nce all predicate § 10(b) claims are dismissed, there are no allegations upon which § 20(a) liability can be based." *Shapiro,* 964 F.2d at 279. Thus, because the section 10(b) and Rule 10b–5 claims are dismissed against all defendants, plaintiffs' section 20(a) claims are dismissed against the individual defendants as well. The court does not resolve defendants' separate contention that plaintiffs have failed to plead adequately section 20 liability.

### III. Conclusion

As a matter of law, the court finds that the defendants did not make material omissions or materially misleading statements for the period from February 13,

**23.** Indeed, only two of the individual defendants, Olim and Sussman, are identified as owners of CDnow stock.

**24.** Section 20(a) provides that
[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

2000 to March 16, 2000. In the alternative, as the PSLRA's direction is to analyze seriously securities class actions at the pleading stage, the court concludes that the complaint is inadequate as pled and is dismissed in its entirety.